**LEWRON TELEVISION, INC.**
v.
**D. H. OVERMYER LEASING CO., Inc.**
**Civ. A. No. 18544.**

United States District Court
D. Maryland.
Oct. 11, 1967.

---

Edward L. Blanton, Jr., Manger, Maxwell, Hughes & Blanton, Baltimore, Md., for plaintiff.

Joseph H. Young, and Paul V. Niemeyer, Baltimore, Md., and Russell M. Brown, Washington, D. C., for defendant.

NORTHROP, District Judge.

In 1966, the defendant, D. H. Overmyer Leasing Co., Inc., a Delaware corporation, was attempting to organize a fourth network, to be known as the Overmyer Network. The first program on the network was to be a two-hour show originating from Las Vegas, Nevada, to be known as the "Las Vegas Show". To carry out this project the defendant entered into negotiations with the plaintiff, Lewron Television, Inc., a Maryland corporation, for the leasing of remote color television facilities. The product of these negotiations was the contract of the parties, dated October 17, 1966.

Paragraph 2 of the contract, as finally amended on March 16, 1967, provided for the payment of $17,000.00 per week for the leasing of the television equipment commencing on May 1, 1967, for a thirteen-week period. The defendant was further obligated by Paragraph 3 to pay overtime and penalty pay required under the union contract, along with living expenses up to $25.00 per day, for two technical supervisors employed by the plaintiff who were to be made available with the leased facilities. As noted by both

parties, the various other provisions of the contract, pursuant to which large sums of money had been paid, are not relevant to the question before the court.[1]

From the beginning the defendant experienced various impediments, all of which were understandable in light of the nature of the venture. Early in 1967 the defendant was attempting to assign its interest in the contract, but was having considerable difficulty because of the size of the liability to which it had originally committed itself. Paragraph 13 of the contract provided that

> "Any provision to the contrary notwithstanding, Overmyer shall have the right, at any time, to terminate this agreement on thirty (30) days' written notice to Lewron, in which event Overmyer's liability shall be limited to the payments set forth herein for such balance as may remain of the then current thirteen (13) week cycle. * * * In such event, Lewron agrees to exert its best efforts to use the facilities elsewhere, and all net revenues and savings shall reduce Overmyer's obligation under this paragraph."

While the defendant did have a right to terminate the agreement under this clause of the contract, the clause clearly subjected defendant to liability, regardless of when he opted to terminate, for thirteen weekly installments, an amount totaling $221,000, less any net revenues and savings obtained by Lewron's leasing the facilities elsewhere.

These undisputed circumstances led to the execution of the February 18, 1967, rider to the contract. It is here noted that the negotiations for the rider were initiated by the defendant, the rider was drawn up by the defendant, and the instrument was finally executed in the New York offices of the defendant.

The first paragraph of this rider states:

> "The modifications to the agreement of October 17, 1966, and the rider dated November 22, 1966, set forth in this rider, shall become effective upon the payment by Overmyer to Lewron on or before February 24, 1967, of $60,-000.00, *said payment being the consideration for this rider.* If said payment is not made, this rider shall be null and void." [Emphasis supplied.]

The court notes that the $60,000.00 was in fact paid.

For its paying the $60,000.00 defendant derived various benefits which are clearly set out in the rider. First, paragraph 6(b) of the rider amended paragraph 13 of the original contract (set out above) which subjected the defendant to a liability in the neighborhood of at least $221,000.00. Paragraph 6(b) of the rider states:

> "Any provision to the contrary notwithstanding, Overmyer shall have the right: * * * (b) During the thirteen week period commencing April 3, 1967 [changed to May 1, 1967, by the rider dated March 16, 1967] to terminate this agreement on 7 days' prior written notice to Lewron, in which event Overmyer's liability shall be limited to payments due prior to the effective date of said 7th day notice, and in no event shall Lewron be re-

---

1. These include:

1) An $11,050 deposit which was made at the execution of the original contract pursuant to § 17 of the agreement which provided that the deposit would "be deducted from the final installment" of the thirteen week period. This provision was amended by the February 18, 1967, rider to the effect that the plaintiff was to retain the deposit for its own account unless the agreement was *extended for an additional thirteen week period.* [Emphasis supplied.]

2) Escrow account deposits had been made by the defendant on two occasions to cover the payments due for the use of the facilities for that period preceding the commencement of the thirteen week period covered by the agreement. The plaintiff received from this account on April 1 and April 30, 1967, sums totaling $54,501.88.

quired to refund any payments theretofore made to Lewron."

This amendment to the contract effectively limited defendant's potential liability under the contract in that it obligated him, after paying the $60,000.00, only to those sums due and owing prior to the effective date of any subsequent cancellation, rather than for the entire thirteen week period.

Second, paragraph 2 of the rider provided that while the defendant would be liable for weekly payments of $17,000.00, the $60,000.00 payment would be applied to the installments due for the final four weeks of the thirteen week period [if the contract was carried through to its completion], namely June 5, 12, 19, and 26. A subsequent rider, dated March 16, 1967, changed the commencement date of the contract from April 3, 1967, to May 1, 1967, and also provided that the $60,-000.00 payment would be applied as follows: On July 3, 1967, the plaintiff would credit the defendant with $9,000.00 against the payment due on that date, i. e., $17,000.00, and on each Monday thereafter, July 10, 17, and 24, the plaintiff would credit the defendant's account to the sum of $17,000.00.

Because of the resultant lessened liability provided for in the rider, the defendant was able to assign its interest in the contract to United Network Co., a limited partnership with offices in New York City, on March 3, 1967, and, according to paragraph 7 of the rider dated March 3, 1967, the defendant was to remain liable for all the payments due regardless of any assignment of the contract. Consequently, when the United Network Co. was in default under the contract after the first three weekly installments were paid for the weeks commencing May 1, May 8, and May 15, the plaintiff notified the defendant. The defendant, however, did not exercise its rights to terminate pursuant to paragraph 6(b) of the February 18 rider until June 2, 1967.

It is not disputed that up to the time of the effective date of termination the sums due the plaintiff were $51,000.00 for the weekly installments for the periods commencing May 22, May 29, and June 5, and $6,683.00 for the overtime pay and living expenses of the two supervisors.

Plaintiff originally brought suit to recover payments for the full thirteen week period. This claim has been voluntarily relinquished, and instead the plaintiff asks for summary judgment for the sums set out above—those due up to the date of termination.

The defendant does not dispute these facts, nor for that matter any of the historical facts. Indeed, the defendant has moved for summary judgment. However, the defendant maintains that the $60,000.00 payment paid in consideration for the rider of February 18, 1967, should be applied to the sums due and unpaid up to the termination date. And if this payment is so applied, then, in effect, there is a cancellation of the debt.

The fact that both parties have moved for summary judgment does not establish, of itself, that there is no issue of material fact and thus require that judgment be granted for one side or the other. American Fidelity and Casualty Co., Inc. v. London and Edinburgh Ins. Co., 354 F.2d 214 (4th Cir. 1965). It must be clearly shown by the moving party that there is no issue as to any material fact. Rule 56(c), F.R.Civ.P. And not only must the facts be free of controversy there must be no controversy as to the inferences to be drawn from them. Cram v. Sun Ins. Office Ltd., 375 F.2d 670 (4th Cir. 1967).

Here the plaintiff has supported its motion for summary judgment by affidavit wherein is contained a statement of facts as they relate to the contract and the subsequent riders. The defendant's motion incorporated by reference the essential facts set out in the plaintiff's papers, and none of the facts relating to either the contract itself or relating to

the circumstances surrounding the contract was called into dispute. At the hearing of this motion, the defendant opposed the granting of summary judgment on the basis that the determination of how the $60,000.00 was to be applied under the contract involved the interpretation of the contract, and, consequently, was an issue of fact not to be determined by the court.

The defendant's objection necessitates a clarification of the question presented to the court. If a genuine issue as to the intentions of the parties was demonstrated, as evidenced by unclear and/or by ambiguous language in the agreement and/or by some extrinsic facts, then summary judgment would not be in order for a question of fact would exist as to the proper interpretation to be considered by the court in construing the contract of the parties. The distinction between interpreting an agreement to arrive at the intention of the parties and the construing of an agreement to define the legal obligations and rights which flow therefrom is important. The line of demarcation between the two steps must be drawn for in summary judgment proceedings it is not within the province of the court to determine the intentions of the parties when such are in dispute.

> "The question of interpretation of language and conduct—the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact. * * There is no 'legal' meaning, separate and distinct from some person's meaning in fact." Corbin, 3 Contracts § 554 (1960); Lamb v. Norcross Bros. Co., 208 N.Y. 427, 102 N.E. 564 (1913).

Here the court is not presented with the problem of interpretation, as that term is defined above. The court finds that a reasonable man reading the clear language of the contract could determine the issue before the court in only one way. The four corners of the instrument do not present an ambiguity which would warrant this court to hold that there is an inference that the defendant was to have the advance payment applied to payments and sums due and owing prior to determination. This, coupled with the fact that circumstances surrounding the execution of this integrated agreement are not in dispute, warrants this court's granting summary judgment to the plaintiff.

If the defendant has facts which would throw doubt on the language of the agreement, he has not come forward with the same. In Minnesota Mining and Mfg. Co. v. United States Rubber Co., the court held "that mere denials unaccompanied by facts which would be admissible in evidence at a hearing are not sufficient to raise a genuine issue of fact". 279 F.2d 409, 415 (4th Cir. 1960). In the same case the court quoted with approval Bros, Incorporated v. W. E. Grace Mfg. Co., 261 F.2d 428 (5th Cir. 1958):

> "But if, on the other hand, there is, by presentation of factual evidentiary details having the substantial characteristics of receivable evidence as compared with conclusions, a convincing showing that no real genuine controversy on the decisive facts exist, a mere formal denial is but a pretended one, and is insufficient. In that situation the respondent must come forward with facts of his own."

Since the amounts which were unpaid prior to the effective date of termination are not disputed, the court will sign an order granting summary judgment to the plaintiff in the amount of $57,683.00, namely $51,000.00 for the three weekly unpaid weekly installments and $6,683.00 for the unpaid overtime pay and living expenses for the two supervisors, with costs.